Filed 4/6/26  Thakore v. MLT Encinitas CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| AJAY THAKORE, | D085184 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2023-00054339-CU-CR-CTL) |
| MLT ENCINITAS, LLC et al., | |
| Defendants, Cross-complainants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Carolyn M. Caietti, Judge.  Motion to augment denied.  Affirmed.

Munck Wilson Mandala, Anton N. Handal, Marina V. Bogorad; Doctor Multimedia and Pamela C. Chalk, for Plaintiff, Cross-defendant and Appellant.

Solomon Ward Seidenwurm & Smith, Owen M. Praskievicz and Mei-Ying Imanaka, San Diego, for Defendants, Cross-complainants and Respondents.

Plaintiff Ajay Thakore sued a local bar and its owner after he was banned from the premises for what he believes were discriminatory reasons. In presuit text messages and statements shared on social media, Thakore aired vague allegations of racism, suggested that he was going to sue, disparaged some of the bar's employees, and allegedly threatened the bar's owner and his family. Defendants asserted counterclaims based in part on the last two categories of statements.

Thakore moved to strike the counterclaims under Code of Civil Procedure, section 425.16[1], the so-called anti-SLAPP (strategic lawsuit against public participation) statute. According to Thakore, the comments defendants rely on are statutorily protected speech, either as having been made in anticipation of litigation or raising an issue of public interest, and their counterclaims lack the minimal merit required to avoid being stricken. We agree with the trial court that Thakore's comments are not protected. Accordingly, we affirm the order denying his motion.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.      *The Parties' Alleged Conduct*

---

[1]      Undesignated statutory references are to the Code of Civil Procedure. In addition, undesignated references to subdivisions (e)(1) through (e)(4) refer to section 425.16.

[2]      We summarize the relevant well-pleaded factual allegations in the complaint, cross-complaint, and defendants' declarations in support of their opposition to Thakore's motion. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*).) We deny defendants' motion to augment the record with a document that was filed late with the trial court and thus not considered during the hearing. (See *In re Marriage of Forrest & Eaddy* (2006) 144 Cal.App.4th 1202, 1209.) In any case, based on the parties' descriptions of the document, our consideration of it would have no bearing on the outcome of this appeal.

2

Thakore characterizes himself as "a successful businessman well-known in the La Jolla community for his success and generosity." In November 2021, he became a regular patron of the local sports bar Nautilus Tavern (Nautilus or the bar). Thakore generated a "large amount of business" for the bar and frequently displayed "generosity towards [its] customers . . . and employees." He claims to have been so "well-liked" that Nautilus reserved seats for him and his dog.

Despite his generosity, Thakore came to believe that Nautilus owner David Odmark and others "began to plot a way to ban [him] . . . in or about February of 2022 due to [his] race and ethnic background." Thakore, who was born in India, thought that defendants "discriminat[ed] against anyone [who] appears to be of Arab or Asian descent." He alleged that Odmark and Nautilus employees subjected him to threats and harassment based on his ethnic background. In November 2022, Thakore was permanently banned from the bar's premises in an act he believes was also based on racial animus.

Defendants give a different version of the reasons for the ban. The fact that Thakore "spent money lavishly" made him feel entitled to "bull[y] and harass[] staff and patrons" and demand other privileges. His demands included "that patrons who [Thakore] called 'poor losers' be removed from Nautilus Tavern at his discretion; that certain managers at the business be prohibited from speaking to him and fired; that the company should install a sign that said 'don't talk to [Thakore] unless he talks to you'; and that the bar should reserve a permanent seat and dog bed for him and his dog." Defendants met Thakore's last demand.

It is unclear when these demands were first made or when Nautilus reserved spots for Thakore and his dog. But he lost those privileges in October 2022 after a Nautilus manager warned him not to bother other

3

patrons. This was not the first time the bar's staff had asked Thakore to leave other customers alone.

Thakore responded by lashing out in text messages to Nautilus employees. To one unidentified employee, Thakore bragged about his wealth, demanded that certain managers not talk to him when he returned to the bar, threatened to "put you on the front page" of a local newspaper, and accused the bar's employees of being "dumb asses" and "poor." He reiterated that he was "[s]till p***** that [his dog's] bed and those reserved signs were thrown out" after "everything [he had] done for that place and the people there." "[I]t was purposeful and spiteful," Thakore concluded.

George Tapia, another Nautilus manager, was also subjected to a text message rant by Thakore. He reiterated that his four previously stated demands should be met as a sign of "respect" for his generosity. Thakore went on to boast about his wealth, insult certain employees, and write that "[s]omeone needs to get fired cause I'm going to f****** drain everyone if it doesn't happen." He also wrote that he "hated doing this to [Tapia] because [he']s the only thing stopping me from f****** your whole world over." Thakore also took to Instagram to make personal attacks against Nautilus and the manager who removed his and his dog's reserved seats.

After learning of Thakore's conduct, Odmark took the unprecedented step of banning him from the bar. This was necessary, Odmark believed, "to protect his employees and patrons and to put a stop to Thakore's ongoing harassment." Thakore's attorney sent Odmark a letter that inquired about the reasons for the ban, but omitted any other demands or threats of a lawsuit. Nautilus responded by confirming the ban.

4

Thakore lashed out again, this time in a series of interrupted text messages to yet a different manager, Kyle Angello:

"Half on getting sued m************

"Have fun

"I am definitely going to enjoy it

"racists

"Let Dan[3] know

"I am going to f*** your whole world up

"Screenshot this for the judge

"Can I get a refund on my $1,000 tip tonight please

"Can I get a refund for every time I paid for the entire bar

"Can I get a refund for every $102000 tip I ever gave you f****** losers

"Can I get a refund for every taco car that I paid for

"I got a refund for every drinking contest on Tuesday that I sponsored

"Dumb m************ don't understand the levels in life

"It's f****** on now f*** y**[.]"

---

3    This appears to be a reference to Odmark.

Thakore also turned to Instagram again, this time to make comments about Odmark, his family, and Angello.[4] He accused Odmark and his wife of "lov[ing]" racially insensitive jokes, said others should not visit Nautilus, and referred to the Odmarks as "[r]acist fucks." Thakore targeted defendants in another post by remarking that he was "still rich and you still a b****." He personally attacked Odmark's wife and Angello, stating, "You want the war now you got one . . . [¶] I'm going after [Odmark's] wife and the place he works until you appease me." In other posts, Thakore made derogatory comments about Odmark's son and characterized Nautilus as "more racist" than another business he had sued.

The relationship between the parties reached a low point in February 2023 when—despite the ban—Thakore entered the bar, ordered a drink, dumped it out, and then urinated on the floor. A week later, Thakore tried to enter Nautilus again but was stopped by Angello, who reminded him of the ban and remarked that he " 'was trying to sue us.' " Thakore laughed off the urination incident but did not respond to Angello's remark about a potential lawsuit.

---

4 The record does not show what method Thakore used to share his comments on Instagram—that is, whether they were "posts," "stories," or "reels." (See generally, Instagram, *Help Center* <https://help.instagram.com/> [as of April 3, 2026], archived at <https://perma.cc/NQ7J-8CYX> [see View Mode: Screenshot].) To avoid confusion, we will refer to his Instagram activity as "posts." The record is also silent as to how long Thakore's comments were visible, whether Thakore restricted who could view and interact with them, and whether anyone did interact with them. (Instagram, *Controlling Your Visibility* (2026) <https://help.instagram.com/116024195217477/?helpref=hc_fnav> [as of April 3, 2026], archived at <https://perma.cc/L386-3HQZ> [see View Mode: Screenshot].)

6

According to defendants, employees and customers were turned off by Thakore's behavior. Nautilus claims that three employees quit because of Thakore's conduct. Forty regular customers of the bar from 2021 to 2023 stated that they spent less time there when Thakore was present because of his "disrespectful," "horribly rude," and intimidatory behavior towards customers and employees.

**B.**  *Thakore's Anti-SLAPP Motion*

Nearly ten months after the urination incident, Thakore sued defendants in December 2023 asserting two causes of action alleging that his ban from the bar was discriminatory:  (1) unfair business practices by Nautilus, and (2) a violation of the Unruh Civil Rights Act by both defendants.  In response, defendants filed a general denial and a cross-complaint asserting four causes of action:  Odmark alleged claims for (1) stalking and (2) intentional infliction of emotional distress; Nautilus asserted alternative claims for (3) intentional and (4) negligent interference with prospective economic relations.

Odmark's counterclaims rely on the following four statements by Thakore (collectively, the allegedly actionable statements):

> "I'm going to f****** drain everyone," in a text message to Tapia;
>
> "I am going to f*** your whole world up," in a text message to Angello; and
>
> "You want war now you got one" and "I'm going after [Odmark's] wife and the place he works until you appease me," in a single Instagram post.

Odmark also relies on the alleged urination incident and unspecified "other statements and conduct." Nautilus's counterclaims incorporate all of these allegations.

In April 2024, Thakore filed a special motion to strike each cause of action from defendants' cross-complaint pursuant to the anti-SLAPP statute.[5] He argued that when read in context of his other text messages and Instagram posts, the allegedly actionable statements are protected by subdivision (e)(2)—because they were made in anticipation of litigation—or by subdivision (e)(4)—because they were his "opinions providing insights, criticism, protests/and or warnings to consumers about a business and its owner" and hence concerned the public interest. Thakore further contended that defendants' claims lacked the minimal merit to survive step two of the anti-SLAPP analysis.

The trial court denied Thakore's motion in October 2024 after finding that none of his speech was protected. But even if it were, the court determined that each counterclaim possessed the requisite minimal merit.

## DISCUSSION

"The anti-SLAPP statute enables defendants to quickly terminate meritless actions against them that are based on their constitutionally

---

[5] Courts use the term " 'mixed cause of action' " to refer to a pleaded count that arises from both protected and unprotected conduct. Courts disregard unprotected activity when reviewing an anti-SLAPP motion, and thus, they sometimes use "claim" or " 'cause of action' " to refer to the portion of a mixed cause of action the motion targets. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 382, 396.) Although defendants' counterclaims appear to be mixed causes of action, neither party argues that any portions would survive were Thakore's motion deemed meritorious. Because the parties do not use "cause of action" and "claim" in the manner just described, we use the terms interchangeably to mean the counts as pleaded.

8

protected rights to speak freely and petition for redress of grievances." (*Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 147 (*Dziubla*).) "It allows litigants to file a special motion to strike ' " 'at an early stage,' " ' in which the trial court uses a ' " 'summary-judgment-like procedure' " ' to evaluate the claims." (*Id.* at pp. 147–148.) "A cross-complaint may be subject to an anti-SLAPP motion based on the plaintiff's right to petition." (*Joslin v. Third Laguna Hills Mutual* (2020) 49 Cal.App.5th 366, 371.)

Thakore challenges the order denying his anti-SLAPP motion directed at Odmark's cross-complaint. Our review is de novo. (*Park*, *supra*, 2 Cal.5th at p. 1067.) We independently review the pleadings and "any affidavits on which liability is based" to determine whether the challenged claims arise from protected activity and, if so, whether they possess "minimal merit." (*Ibid*; see *id.* at p. 1061.) We do not "weigh the evidence, but accept the plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Ibid.*)

Courts use a two-step process to resolve a special motion to strike under section 425.16. At step one, "the moving defendant bears the burden to establish that the challenged claim arises from [its] protected activity." (*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 425 (*RGC Gaslamp*).) "If the defendant carries its threshold burden, the burden then shifts to the plaintiff" at step two "to demonstrate that its claims have minimal merit." (*Ibid.*) " 'The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment.' " (*Ibid.*) "If a plaintiff does not make that showing, a court will strike the claim." (*Ibid.*)

A defendant " 'must make two related showings' " for his motion to survive step one. (*RGC Gaslamp, supra*, 56 Cal.App.5th at p. 425.) They are: (1) a prima facie showing that its conduct qualifies for protection under the statute and (2) that its protected conduct " 'supplies one or more elements of the challenged claims.' " (*Ibid.*) Subdivision (e)(1) protects writings and statements made "in connection with an issue under consideration or review by a . . . judicial body," which includes " ' "communications preparatory or in anticipation of bringing" ' " a lawsuit. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 321, fn. 8 (*Flatley*); *id.* at p. 322, fn. 11.) The "catchall provision" of subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right to petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Thakore's motion was properly denied because he cannot meet his burden at step one under any theory.

## A.    *Step One:  Statements In Anticipation of Litigation*

Thakore invokes the protection of subdivision (e)(2) for the allegedly actionable statements, arguing that his contemporaneous threat of legal action in a text message to Angello and his known propensity to sue other restaurants over similar disputes signaled that litigation over the ban was "loom[ing]." Defendants counter that Thakore's threat of litigation was not genuine and thus unprotected. Moreover, defendants contend, there is no connection between the lawsuit he threatened and their counterclaims as required to find that their cross-complaint arose from protected activity.

We analyze whether a presuit statement is protected under subdivision (e)(2) by first determining whether it "intrinsically anticipates litigation." (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 429.) If it does, we limit our

10

analysis to the statement itself.[6] (*Medallion Film LLC v. Loeb & Loeb LLP* (2024) 100 Cal.App.5th 1272, 1286 (*Medallion*) [statements "intrinsically preparatory to litigation" require "no analysis of surrounding circumstances . . . to determine that they were protected prelitigation activity"].) But if does not, we borrow from similar analysis employed in applying the litigation privilege, codified at subdivision (b) of Civil Code section 47, and confer protection to the statement only if the surrounding circumstances show that it was made "in good faith while litigation was seriously contemplated." (*RGC Gaslamp*, at p. 429.) This approach both "protects prelitigation communications made in genuine contemplation of litigation" and weeds out "communications made when litigation is 'just a negotiating tactic or a hypothetical possibility.' " (*Medallion*, at pp. 1285–1286.)

Against this backdrop, we conclude that any threat of litigation accompanying Thakore's various electronic rants neither intrinsically anticipated litigation nor was made in good faith after serious consideration of the need for legal action. Starting with the threat itself, it was made in a text message to Angello—not directly to Odmark—and omitted important details about who would be sued, when the complaint might be filed, what the basis for the suit would be, and whether there were any demands

---

[6] Examples of statements or communications that intrinsically anticipate litigation include the act of recording a mechanic's lien, which "is a necessary prerequisite to a foreclosure action[]" but not for "anything else" (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 430), parties' accusations made after "a dispute has moved to the point of clearly threatened commencement of legal proceedings" (*Nirschl v. Schiller* (2023) 91 Cal.App.5th 386, 402 (*Nirschl*)), and letters sent by attorneys concerning anticipated litigation (*Pech v. Doninger* (2022) 75 Cal.App.5th 443, 462 [letter to clients]; *Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1293 [letters to opposing parties in disputes are "ordinarily" protected]).

Odmark could meet that would obviate the need for court proceedings. In short, merely using the word "racists" adjacent to a vague threat of litigation was not enough to intrinsically anticipate the lawsuit Thakore eventually filed against defendants.

Turning to the circumstances surrounding Thakore's threat, they reveal that a lawsuit was just a nascent possibility at the time. His later Instagram posts about "going after" Odmark's wife and Nautilus until he was "appeased" strongly suggested that his mention of a potential lawsuit was meant to be a negotiation tactic to pressure defendants to lift the ban, or perhaps meet some of his demands, *without* litigation.[7] Further, were Thakore serious about filing suit, we would have expected to find one or more communications from his attorney to Odmark giving teeth to his threat, considering how quickly he engaged his attorney merely to question whether the ban had been imposed. Although a statement need not come from an attorney to be protected under subdivision (e)(2) (see *Nirschl, supra*, 91 Cal.App.5th at p. 402; *Dziubla, supra*, 59 Cal.App.5th at pp. 149–150), the absence of the involvement of one under the circumstances here shows that Thakore's vague threat to sue was not made in good faith after careful consideration of the need for litigation.

We are not persuaded to interpret Thakore's threats differently in light of either his lawsuits against other restaurants he accused of similar behavior or Angello's remark after the urination incident that Thakore was

---

[7] "Appease" means to (1) "pacify, conciliate, *especially*: to make concessions to (someone, such as an aggressor or a critic) often at the sacrifice of principles; (2) "to cause to subside: allay"; or (3) "to bring to a state of peace or quiet." (Appease, Merriam-Webster Unabridged Dict. Online (2026) <Https://www.merriam-webster.com/dictionary/appease> [as of April 3, 2026], archived at <https://perma.cc/49BE-92JW>.)

12

" 'trying' " to sue Nautilus. If anything, his decision not to respond in the affirmative to Angello's comment in February or March 2023 about a potential lawsuit supports our conclusion that he had not seriously considered the need for legal action when he made his threat in October or November 2022. But more to the point, our focus is on the state of *Thakore's* contemplation of litigation in *this case*, which the record reveals had not advanced beyond the hypothetical stage when he made his threat.[8]

## B. *Step One: Statements Concerning an Issue of Public Interest*

Thakore also invokes the protections of subdivisions (e)(3) and (e)(4) for the allegedly actionable statements. As Thakore describes it, he "became a vocal critic of Nautilus" after the ban by embarking on a "campaign to raise public awareness of Nautilus' discriminatory practices including posting on his Instagram account, wherein he accused Nautilus' owners of racism." Thus, he concludes, when read in this context, the allegedly actionable statements raised the public interest issue of the "character or value of a business's products and services."

Subdivisions (e)(3) and (e)(4) protect speech associated "with an issue of public interest," a term section 425.16 does not define.[9] Accordingly,

---

[8]    We need not discuss other elements of the litigation privilege analysis that the parties urge us to import into our anti-SLAPP evaluation. (See *Medallion*, *supra*, 100 Cal.App.5th at p. 1290 [good-faith-and-under-serious-consideration condition is necessary but not sufficient for litigation privilege to attach].)

[9]    Subdivision (e)(3)—which Thakore invokes for the first time on appeal—protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." The fundamental difference between subdivisions (e)(3) and (e)(4) is that the latter covers public *and* private communications concerning a

13

applying these subdivisions "invokes the public/private distinction, which is one of the most malleable in all the law." (*Jeppson v. Ley* (2020) 44 Cal.App.5th 845, 850 (*Jeppson*).) "Most often, courts strive to discern what the challenged speech is really 'about'—a narrow, largely private dispute, for example, or the asserted issue of public interest." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).)

We apply a two-pronged test to make this determination. First, we identify the public issue that the statements concern. (*FilmOn, supra*, 7 Cal.5th at p. 149.) Second, we examine "the 'functional relationship' between the challenged activity and the public issue it implicates, and ask whether the activity contributed to public discussion of that issue." (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1246 (*Geiser*).) Generally, speech may concern a public issue if it involves (1) a person or entity in the public eye, (2) conduct that could directly affect a large number of people beyond the direct participants, or (3) a topic of widespread public interest. (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621.) But speech that interests only a limited portion of the public must " 'occur in the context of an ongoing controversy, dispute or discussion' " to be protected. (*FilmOn*, at p. 145, quoting *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 (*Du Charme*).)

We consider the content and context of the statements at both prongs of this analysis. (*Geiser, supra*, 13 Cal.5th at p. 1252.) Thus, we look to the audience, speaker, location, purpose, and timing of the speech. (*Id.* at

public issue. (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1467].) Because we conclude that Thakore's speech did not concern an issue of public interest, we do not resolve whether his Instagram posts were made on a public forum as separately required by subdivision (e)(3).

pp. 1252–1253.)  It is often the case that "many of the same contextual considerations that compel us to conclude that the protest implicated public issues also compel us to conclude that the protest furthered public discussion of them." (*Id.* at p. 1256.)  Accordingly, "it may be more efficient to look to the whole context from which the conduct underlying the lawsuit arises, rather than attempting to parse which considerations fall under which of *FilmOn*'s two steps." (*Ibid.*)  We take this approach here.

"While racism is undoubtedly an issue of public interest, a defendant cannot convert speech that would otherwise not be entitled to anti-SLAPP protection into protected activity by 'defining the[] narrow dispute by its slight reference to the broader public issue.' " (*Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 24; accord *FilmOn, supra,* 7 Cal.5th at p. 150 [" 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate' "].)  As an apt application of this principle, a celebrity calling a bartender a " 'racist' " multiple times during a "tantrum" after the bartender refused to serve him alcohol was not an issue of public interest because " 'the content of [the defendant's] communication added nothing to any public discourse or interest.' " (*Bernstein*, at p. 24.)  This was so even though the celebrity was a famous actor in the public eye, videos of the incident were widely disseminated, and members of the public reacted by disparaging the bartender.  (*Id.* at pp. 19, 24.)

Thakore's so-called campaign against defendants had a far more limited reach that the allegation of racism in *Bernstein,* but had in common with it the absence of any evidence that the allegation contributed to the public discourse.  The record is devoid of any sign there was already a debate about discrimination at Nautilus that Thakore's text messages added to or

15

influenced. (*Du Charme*, *supra*, 110 Cal.App.4th at p. 119; accord, *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 903 ["the private context . . . here makes heavier CNN's burden of showing that, notwithstanding the private context, the alleged statements nevertheless contributed to discussion or resolution of a public issue for purposes of subdivision (e)(4)"].) And although Thakore's Instagram posts could be read by the public as implying that *something* he believed was discriminatory had occurred at Nautilus, there is nothing in the record showing that anybody outside of those directly affected had any idea what that something was. Indeed, there is no evidence of how many people *could* read his posts, how many people *did* read them, and whether anyone actually cared about what he had to say.[10] (See fn. 3, *ante*.)

The fact that Thakore's Instagram posts were available on the Internet does not change the character of his speech. In another apt example, a neighborhood blog post by an author who—like Thakore—"claimed the title of town crier," did not involve an issue of public interest because the blog post—like Thakore's Instagram posts—directly involved only a few people and was "merely an effort to gather ammunition for another round in the speaker's neighborhood wrangle." (*Jeppson*, *supra*, 44 Cal.App.5th at pp. 848–849, 856.) As succinctly observed in *Woodhill Ventures, LLC v. Yang* (2021) 68 Cal.App.5th 624, 633, speech about a private dispute with a business does not involve the public interest just because the nature of the spat is amplified on

---

[10]     Thakore contends that defendants' allegation of customers " 'frequent[ing] the business less or [not] frequenting the business altogether" are tied to his messages and Instagram posts. The cited portion of the record, however, shows that Nautilus's customers changed their behavior in response to Thakore's behavior they personally witnessed, not on their reading of his text messages or Instagram posts.

16

social media: "Shouting makes the volume loud. It does not make the content worthy." (*Ibid.*)

We are unconvinced by Thakore's attempt to ascribe a loftier purpose to his outbursts by analogizing them to speech that courts have protected because it involved the nature of a business's products or services. He points to cases where the public interest was implicated by speech concerning the "qualifications, competence, and professional ethics of a licensed physician" (*Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 947), warnings to others about the "trustworthiness" of a business owner (*Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1142, 1146–1147), and comments calling into question a bank's representations of its financial stability (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 693–695). Although these cases can be distinguished on many grounds, they all have in common the material distinction that none involved speech, like Thakore's, consisting entirely of personal attacks unconnected to the target business's services.

While we must be mindful that "if the social media era has taught us anything, it is that speech is rarely 'about' any single issue" (*FilmOn, supra,* 7 Cal.5th at p. 149), we are unconvinced that Thakore's text messages and Instagram posts amounted to anything other than venting about perceived slights by Nautilus and Odmark. Adding that Thakore believed he was a victim of racism, without more, did not elevate his private dispute into a matter of public concern. The allegedly actionable statements, therefore, are not protected by subdivisions (e)(3) or (e)(4). Thakore's motion was properly denied.[11] (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1162.) And having

---

[11] This conclusion obviates the need for us to consider defendants' alternative arguments, including that the allegedly actionable statements are not protected because they are illegal speech.

17

concluded that Thakore's statements are not protected under subdivision (e) of section 425.16, we need not discuss step two of the anti-SLAPP analysis. (*Sheley*, at p. 1162.)

## DISPOSITION

The order is affirmed.  Nautilus and Odmark shall recover their costs on appeal.


DATO, Acting P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.